# Richmond

## The Chesapeake and Ohio Railway Company v. Herman F. Nickel.

November 12, 1931.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Leake & Spicer,* for the plaintiff in error.

*Claude R. Yardley,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The defendant in error instituted an action by notice of motion against the plaintiff in error for damages arising out of a collision between a passenger train which was being operated by the plaintiff in error and a Chevrolet truck, which was being operated by the defendant in error. The collision occurred while the truck was "stalled" on a private crossing on the tracks of the plaintiff in error and it resulted in the complete destruction of the truck.

There were two trials of the case in the court below. The first trial resulted in a verdict for the plaintiff in error. The trial court for reasons to be discussed later on in this opinion set aside the verdict of the jury on the motion of the defendant in error and awarded a new trial. The second trial resulted in a verdict for the defendant in error for damages

amounting to $500.00. The trial court entered judgment on the verdict and the plaintiff in error is here complaining of certain rulings of that court, objections and exceptions to said rulings having been properly preserved in the record.

From this point on the defendant in error, Nickel, will be referred to as the plaintiff, and the plaintiff in error, The Chesapeake and Ohio Railway Company, as the defendant, the positions they occupied in the trial court.

The plaintiff filed his notice of motion against the defendant, alleging two separate acts of negligence, which are in substance, first, that the defendant failed to maintain the crossing in question in a "safe and passable" condition and in its failure to perform its duty in this respect it was responsible for the stalling or stopping of the plaintiff's truck on the tracks of the railroad in front of an approaching passenger train, and secondly, that while the truck was stalled on the track of the defendant and while the plaintiff was attempting to move or push it from the track, the servants and employees of the defendant negligently drove its locomotive or train on said track and collided with the truck causing its total destruction.

The defendant filed its plea of not guilty, a notice that it would rely upon the contributory negligence of the plaintiff and its grounds of defense.

The major portion of the facts which seem to have been established and over which there appears to be no dispute may be stated thus: The plaintiff is a farmer living in the county of Albemarle and the defendant's railroad track, running from Charlottesville to Washington, D. C., runs through his farm. He owns the land on both sides of the right-of-way of the defendant at the point in question. The plaintiff lives a short distance from the crossing where the collision occurred and from his dwelling he has a full view of it. He had lived at this place for a number of years prior to the accident and was thoroughly familiar with the

crossing. He had used it daily for a long time prior to the day on which the collision occurred. He also knew that the passenger train was scheduled to pass about the time he arrived at the crossing. The defendant's track at this point is a single track and extends in an easterly and westerly direction. The plaintiff was driving his truck in a southerly direction. The road over which he was driving was a county road which had previously been established as such up to a point where it adjoins the north side of the defendant's right-of-way. The road begins at Tyler's Garage, which is in a northerly direction from the crossing, and extends to the northerly side of the defendant's right-of-way. The plaintiff was attempting to cross over the defendant's track on the crossing from the northerly side to the southerly side. The road as it crossed the crossing was a private road and not a grade crossing of a public highway. The crossing had been maintained by the defendant for a number of years. As the track is approached from the northerly side, the approach made by the plaintiff, the grade ascends to the track four and one-half to five feet over a distance of twenty-five to thirty feet running back from the track. The accident occurred on November 9, 1929, at approximately 1:05 o'clock in the afternoon. At a point on the road two hundred and three feet north of the track the traveler has a vision down the track in the direction from which the train came a distance of 1,682 feet, and from the center of the crossing, one has a clear vision in the same direction for 2,021 feet. The engineer's vision of the crossing, due to a slight curve against him, was obstructed by the boiler and front portion of the locomotive, until the locomotive had rounded the curve and straightened itself out on a straight line. The distance from the crossing to the curve is 746 feet, which gave the engineer a view of the crossing for something less than that distance. The engineer was keeping a proper lookout and the fireman was adjusting the stoker in order

that it would properly feed the coal, and while performing, this duty he was not looking ahead on the track. He was charged with the duty of looking ahead when practical and consistent with his other duties. He and the engineer saw the truck on the crossing about the same time at a point where the engine had rounded the curve and straightened on a line with the crossing. The train was traveling at the rate of fifty or fifty-five miles per hour and when the emergency brakes were applied, a good stop was made. It was impossible to have safely brought the train to a complete stop before reaching the crossing. It was stopped after the brakes were applied within approximately 1,300 feet and according to the uncontradicted testimony of the engineer and fireman it could not have been safely stopped in a shorter distance.

A colored employee was riding with the plaintiff and as the truck reached the track and the front wheels had passed over the south rail the motor stopped or stalled leaving the rear wheels between the rails. The front wheels had passed over both rails. The plaintiff attempted to start the motor but failed. The employee saw the train coming and he and the plaintiff got out and attempted to push the truck over the track but were unable to do so. They were forced to leave the truck on account of the approaching train, which in a very short time collided with the truck and demolished it.

The foregoing facts as before stated are established and are not in dispute.

The defendant was obligated to maintain the crossing in a reasonably safe condition and the conflicts in the evidence arise over the condition of the crossing. The plaintiff introduced a number of witnesses who testified that the crossing was not in good condition; that the ballast between the rails was low, making it difficult to drive over the rails. On the other hand the defendant introduced a number of

witnesses who testified that the crossing was in safe and good condition.

As previously stated, upon the first trial the jury found for the defendant and the court set the verdict aside and awarded· a new trial, and upon the second trial the jury found for the plaintiff in the sum of $500.00 and judgment was entered on the verdict for the plaintiff.

The doctrine of the last clear chance was not invoked by the plaintiff and the evidence clearly shows that it has no application to the facts and circumstances of this case.

In both the first and second trials of the case in the court below, the court on the motion of the defendant struck the plaintiff's evidence as to the second ground of negligence alleged in the notice, to-wit: That "the servants and employees of said railway company did so negligently and recklessly drive a locomotive or engine of the Chesapeake and Ohio Railway Company on said track, that said locomotive ran into, collided with, and hit said truck."

This charge of negligence was not sustained by the evidence and the lower court very properly refused to submit that issue to the jury upon either trial. The verdict rendered at the first trial was not set aside on account of this ruling of the court but, as we shall later see, upon entirely different grounds. It will, therefore, be unnecessary to deal further with the second ground of negligence alleged in the notice. It does not enter into the decision of the case.

Where there have been two trials of a case in the lower court it is the duty of the appellate court to look to the evidence and proceedings of the first trial and if it is discovered that the court erred in setting aside the verdict rendered at that trial, it will set aside all proceedings subsequent to the verdict and enter judgment thereon. Many cases could be cited in support of this rule prior and subsequent to the Code revision of 1919, but the following, we think suffice: *Clark* v. *Hugo*, 130 Va. 102, 107 S. E. 730;

*Hogg* v. *Plant*, 145 Va. 175, 133 S. E. 759, 47 A. L. R. 308; *Peninsula Produce Exchange* v. *Upshur*, 149 Va. 639, 140 S. E. 651.

The lower court in its order indicated two reasons for setting aside the first verdict and awarding a new trial. First: That it entertained "grave doubt" as to the correctness of its ruling in excluding certain evidence offered in behalf of the plaintiff, and secondly, in declining to grant to the jury a view of the premises. If the court erred in setting aside the verdict for the foregoing reasons (there being no other valid reasons disclosed for setting it aside), then under the rule of decision previously referred to where there have been two trials of a case in the lower court, this court will annul all subsequent proceedings and enter judgment upon the verdict rendered in the first trial. It therefore becomes necessary to inquire into the correctness of the ruling of the court in excluding the evidence referred to and in failing to grant the jury a view.

The evidence excluded consisted of two voluntary statements not made in response to any question asked by counsel. When the plaintiff's witness, Mrs. Susie Musselman, was asked this question: "I wish you would state to the jury what the conditions of the crossing were at that time?" she replied:

"I think the last time I crossed there just before I heard of the accident I was driving across and my car stalled at that same place and it was quite a while before I could get started again, and I feel confident that if the train had been as near me as it was Mr. Nickel, the same thing would have happened to me.

"Mr. Leake: We object.

"The court: Objection sustained. Did you object to what she felt or what her car did?

"Mr. Leake: Both.

"The court: Gentlemen of the jury, what experience this

lady may have had with her car and what her impression was as to what she felt might have happened isn't to be considered by you as evidence in the case, only what she can tell you as to the actual condition of the crossing, so you can draw your own conclusion as to the condition of the crossing and not what some other car might have done. The fact that a person's car stalled does not necessarily mean the roadbed is in bad condition, consequently you are not to consider anything except what she may tell you as to the actual condition of the crossing. If she can tell just what the condition of the crossing was, whether in bad condition, if so, in what respect, that will be proper evidence.

"Mr. Yardley: If your honor please, I would like to say, I feel that, where a crossing is in such a condition that several cars stalled on such crossing, it is proper to show in evidence that various ones at different times and under different conditions stalled on this crossing. I am not taking any exception to your honor's ruling, but it seems to me that should be evidence for the jury.

"The court: No, sir. That would not be any more evidence than the fact that hundreds do cross without stalling. Neither one would be evidence of the good or bad condition. She can tell what the condition was and the jury can tell whether it was likely to stall a car.

"By Mr. Yardley:

"Q. How are the approaches to that crossing?

"A. I think it is a very steep grade as I start going up to the railroad track.

"Q. Did you ever observe the condition of that crossing between the rails?

"A. As I remember it, Mr. Yardley, it was quite low between the rails."

Again when plaintiff's witness, Garrison, was asked this question: "What was the condition of that crossing three days before the accident?" he replied:

"It was a real steep crossing, and three days before Mr. Nickel had this accident I was driving a Whippet car. It is steep, and I went up on it, pushing a little gas on it, and as a general thing a man will do that; when I got on top I let my gas off. That causes your engine to tend to idle. My engine stopped just like Mr. Nickel's did, but my starter took and I got off.

"Mr. Spicer: We object.

"The court: Objection sustained. Don't tell what your car did but tell about the condition of the roadbed at the crossing.

"Witness: The road is steep.

"The court: I mean actually on the crossing.

"Witness: It was down about four and a half inches, the ballast down, when I crossed there about three days before. The ballast had worn down and it made it steep on the rail.

"The court: Anything about the condition is proper.

"By Mr. Yardley:

"Q. Was there much ballast between the rails?

"Mr. Spicer: We object.

"A. No, sir; not very much.

"The court: The witness already testified there was very little ballast.

"Witness: It was down about four and a half inches I should say. It is steep going any way on the railroad. It dips and goes off a level on the bridge; that is going south."

It will be observed that when the court excluded the statement of Mrs. Musselman with reference to the stalling of her car on the crossing, counsel for the plaintiff expressly stated "I am not taking any exception to your honor's ruling" and when the court excluded a like statement made by witness Garrison, counsel for the plaintiff remained silent and made no objection whatever.

It will also be observed that both of these witnesses testified in substance that the condition of the crossing was

not good. Mrs. Musselman stated that "it was quite low between the rails" and Garrison stated that "it (the ballast) was down about four and a half inches, the ballast down, when I crossed there about three days before."

■ We do not think the trial court was justified in setting aside the verdict on account of excluding this evidence, because the plaintiff did not object or except to the ruling of the court in excluding the evidence and further because the plaintiff was in no way prejudiced by it, for the two witnesses testified as to the defects in the crossing. The weight of their direct testimony to the effect that the condition of the crossing was not good, could not have been strengthened by permitting them to testify that their cars had stalled on the crossing.

A number of cases cited in the briefs dealing with the admissibility of evidence of prior accidents have no application in the present case.

Undoubtedly, there are cases in other jurisdictions in which it has been held that proof of other accidents, or near accidents, at the same crossing at other times under the same or similar conditions may be admitted for the purpose of showing the existence of the dangerous condition of the crossing. This is the rule laid down in 52 C. J. page 415, and is further supported in an extensive note in 65 A. L. R. 380, where a large number of cases, other than crossing cases, are collected and annotated, but in the present case this rule has no application for the reasons we have already pointed out.

The other ground on which the court based its ruling in setting aside the verdict was its failure to award to the jury a view of the premises. This question arises in this way:

"Mr. Yardley: I would like to have jury view the situation out there.

"The court: We will see whether it is necessary. It may not be necessary.

"Mr. Leake: It is agreeable to us.

"The court: It may not be agreeable to the jury. If the jury can get all the information they want without going there it might not be necessary to go. I can't tell at this time whether it is necessary or not."

And again, after the case had been submitted to the jury and they had retired to their room to deliberate, but before a verdict had been found, the court called the jury out of its room and into open court and asked the jury if they desired to have a view of the premises; the court saying:

"If the jury feel like you want to go down and look at that crossing, I would be glad for you to go down there. I thought, after looking at those plans, you would think it unnecessary. If you think it necessary, I will be glad to go down with you."

And the spokesman for the jury replied:

"I think we have about decided we can get all the information we want without going down there."

To this action of the court and jury there was no objection whatever by either the plaintiff or defendant.

The power of the court to grant to the jury a view of the premises is conferred by section 6013 of the Code, which reads as follows:

"The jury may, in any case, civil or criminal, at the request of either party, be taken to view the premises or place in question, or any property, matter or thing, relating to the controversy between the parties, when it shall appear to the court that such view is necessary to a just decision; provided, that in a civil case the party making the motion shall advance a sum sufficient to defray the expenses of the jury, and the officers who attend them in taking the view, which expenses shall be afterwards taxed like other legal costs."

In *Lorillard Co.* v. *Clay*, 127 Va. 734, 104 S. E. 384, 387, the rule is laid down that the granting of a view lies largely

in the discretion of the trial court. The following quotation from that case would seem to settle the question against the plaintiff:

"We have reviewed most of our recent decisions on the subject of views by the jury, and, while there is some variation in the language·used in the different cases, we are content to rest our conclusion on the statement that the propriety of ordering a view lies largely in the discretion of the trial court, which should only grant it when it is reasonably certain that it will be of substantial aid to the jury in reaching a correct verdict, and that its decision refusing a view will not be reversed unless the record shows that it did appear to the trial court that such view was necessary to a just decision, and that the statutory provision for expenses in a civil case were complied with. Code, section 6013."

The ruling of the court in declining the view was not under the circumstances erroneous but even if it had been, the plaintiff abandoned his motion for the view and acquiesced in the ruling of the court. If he desired a view he should have insisted upon his motion and if the court had ruled against him he should have saved his exception in the record. Even if he had properly preserved his exception this court would not be justified in reversing the judgment unless it plainly appeared that the court abused its discretion.

Another very important reason why the view was not necessary was that the evidence conclusively showed that at the time of the trial the crossing was in first class condition. This is shown by the plaintiff's own witnesses. Where the condition of the premises has been changed the jury would receive no benefit from a view.

The condition of the crossing was described by the witnesses. It was shown by the blue prints and photographs and sufficient information furnished the jury to enable them intelligently to decide the case without a view and in addi-

tion the court, counsel and jury by expressions and conduct did not think a view was necessary. We do not think that the court abused its discretion in the ruling complained of.

The record discloses that under the evidence there was just one issue to be submitted to the jury and that was whether the defendant had failed to properly maintain the crossing in a safe condition. This issue was fairly submitted to the jury on the conflicting testimony of the witnesses, under proper instructions, and by their verdict the jury found that the defendant did properly maintain the crossing in a reasonably safe condition. The plaintiff was entitled to only one fair trial on that issue and this he secured by the first trial.

It is unnecessary to discuss the question of contributory negligence which was relied upon by the defendant.

The judgment of the trial court is reversed and this court will now enter a judgment for the defendant on the verdict rendered upon the first trial.

*Reversed.*